FILED

2026 Mar-23  AM 08:11
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
WESTERN DIVISION

| | | |
|---|---|---|
| DAVID RISSLING, et al., | } | |
| | } | |
| **Plaintiffs,** | } | |
| | } | |
| v. | } | Case No.: 7:23-cv-01326-RDP |
| | } | |
| MAGARIA BOBO, et al., | } | |
| | } | |
| **Defendants.** | } | |

## MEMORANDUM OPINION

This matter is before the court on the parties' respective Motions for Summary Judgment (Docs. # 59, 71). The Motions have been fully briefed. (Docs. # 59, 71, 78, 84). The court also ordered supplemental briefing, which the parties submitted. (Docs. # 105, 106, 107, 108). After careful review and for the reasons discussed below, Plaintiffs' Motion (Doc. # 59) is due to be denied, and Defendants' Cross-Motion (Doc. # 71) is due to be granted.

## I.    Background[1]

David Rissling, Eric Peebles, Gail Clayton, and Gilley Presley are Alabama voters with print disabilities.[2] Plaintiffs Presley and Rissling are completely blind and live in Tuscaloosa County. (Docs. # 56-3 at 12:19; 56-4 at 16:1). Plaintiff Clayton has advanced glaucoma that has significantly damaged her vision and lives in Jefferson County. (Doc. # 56-5 at 12:10, 18:16-17, 19:6-8). Plaintiff Peebles has cerebral palsy and lives in Mobile County. (Doc. # 56-2 at 8:15-16,

---

[1] The facts set out in this opinion are gleaned from the parties' submissions and the court's own examination of the evidentiary record. When the moving party will ultimately have to carry the burden of proof, all reasonable doubts about the facts have been resolved in favor of the nonmoving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). A different approach applies when the movant will bear the burden of proof on a claim or defense. These are the "facts" for summary judgment purposes only. They may not be the actual facts that could be established through live testimony at trial. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

[2] A "print disability" is a disability that limits a person's ability to use printed materials. Print disabilities include vision disabilities, like blindness and low vision, and manual dexterity disabilities, like cerebral palsy. (Docs. # 56-1 at 6; 56-2 at 71:10-23).

16:1-4). Plaintiffs Clayton and Rissling are both members of the National Federation of the Blind of Alabama ("NFB-AL"). (Doc. # 56-6 at 10).

Magaria Bobo, Susan Potts, and Jacqueline Anderson-Smith are the absentee election managers ("AEMs") for Alabama's three largest counties. Defendant Bobo is the AEM for Tuscaloosa County (Doc. # 56-11 at 35:12-18), Defendant Potts is the AEM for Mobile County (Doc. # 56-12 at 25:8-15), and Defendant Anderson-Smith is the AEM for Jefferson County (Doc. # 56-13 at 29:23-30:3).

Each AEM maintains a staff to assist with the performance of their duties. Defendant Potts (Mobile) has "about ten employees," but that number "varies according to the demands of each particular election." (Doc. # 56-12 at 27:16-20). Defendant Bobo (Tuscaloosa) has "three helpers," but has received additional support from probate court employees when there has been an influx of absentee voters. (Doc. # 56-11 at 55:17-56:15). Defendant Anderson-Smith (Jefferson) has "a staff of ten," but when her office received an influx of absentee voters, she was able to "request . . . more people." (Doc. # 56-13 at 30:16-33:12). On one Election Day, her staff grew to 75 people. (*Id.*).

A.    **Alabama's absentee voting program generally**

Under Alabama law, citizens who wish to vote absentee must meet one of eight eligibility criteria. Ala. Code § 17-11-3. The eligibility criteria include those who have "any physical illness or infirmity which prevents his or her attendance at the polls, whether he or she is within or without the county on the day of the election." *Id.* Also, "a qualified voter who has a permanent disability preventing his or her attendance at the polls may vote by absentee ballot." *Id.* § 17-11-3.1.

Citizens must apply for an absentee ballot. There are three ways to apply to vote absentee:

(1) request and complete a paper application in person at the AEM's office;

(2) request an application over the phone, receive it by mail, complete it on paper, and

2

return it in person or by mail/commercial carrier; or

(3) download an application from the Alabama Secretary of State's website and, before

printing the application and returning it in person or by mail/commercial carrier, either

(a) complete the application on paper or

(b) complete the fillable PDF version of the form using a computer.

(Doc. # 56-14 at 6 (outlining the absentee voting process for AEMs)). Generally, because of their disabilities, Plaintiffs can neither fill out a paper application on their own nor use a screen reader to fill out an online PDF application. (*See* Docs. # 56-2 at 78:12-79:2, 80:20-81:7; 56-3 at 27:5-16; 56-4 at 61:2-9, 64:15-19; 56-5 at 49:23-50:6). The exception is Plaintiff Peebles who is able to complete the online PDF version of the absentee application because he is sighted and does not require accessible formatting for online fillable forms. (*See* Doc. # 56-2 at 103:9-22). Peebles used Dragon Naturally Speaking speech recognition software to fill out the form. (*Id.*; *see id.* at 43:20-45:10). Alabama's online PDF application is not readable or fillable by screen reader technology that print disabled people regularly use. (*See* Docs. # 56-14 at 6; 56-23 at 6-7 ("[A] screen reader user could not read or fill [the online PDF application]").[3]

Once the AEM determines that a voter is qualified to vote absentee, the absentee voter may vote in one of two ways: (1) receive a paper absentee ballot by mail (remote voting), or (2) vote early in person at the AEM's office (early voting). (Docs. # 56-11 at 42:6-43:5, 49:1-16, 88:24-

---

[3] The court notes that, absentee voting applications are available only on paper or as an online PDF that is not readable or fillable by screen reader technology. (*See* Docs. # 56-14 at 6; 56-23 at 6-7 ("[A] screen reader user could not read or fill [the online PDF application].") Because of their print disabilities, Plaintiffs cannot fill out the paper version of the application. (*See* Docs. # 56-2 at 78:12-79:2, 80:20-81:7; 56-3 at 27:5-16; 56-4 at 61:2-9, 64:15-19; 56-5 at 49:23-50:6). And, Plaintiffs Rissling, Presley, and Clayton could fill out the online PDF version of the application only if it were fillable using their screen reader technology, which it is not. (*Id.*).

This is not an issue here for two independent reasons. First, the Secretary of State, not the Defendant AEMs, is responsible for the absentee ballot application, and the Secretary of State is not a party to this action. Ala. Code § 17-11-4(a). Second, Plaintiffs did not allege in their Complaint that the absentee ballot application process was inaccessible (*see generally* Doc. # 4), and the court declines to grant relief on a theory not pleaded. *See Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004) ("A plaintiff may not amend her complaint through argument in a brief opposing summary judgment.").

91:13; 56-12 at 47:4-7, 77:7-79:5; 56-13 at 64:20-65:9, 72:24-73:9, 75:1-15). Alabama law requires that the absentee ballot be witnessed by two witnesses or notarized.[4] Ala. Code § 17-11-10(b)(2).

As for the early voting option, Plaintiffs do not drive and cannot transport themselves.[5] The ExpressVote machine available at AEMs' offices before Election Day provides an accessible means of voting privately and independently for most of the individual Plaintiffs. (Docs. # 56-3 at 48:1-6; 56-4 at 64:4-10; 56-5 at 29:19-22, 30:9-12, 33:11-16. *But see* Doc. # 56-2 at 87:16-89:21.).[6] The ExpressVote machine is a ballot-marking device designed for voters with disabilities. (Doc. # 56-12 at 134:17-135:25). A poll worker loads the appropriate ballot style onto a card and inserts it into the machine, after which the voter makes their selections either via touchscreen or, for those with visual impairments, through earphones combined with a directional keypad that also supports Braille. (*Id.*) Once the voter finishes, the machine reads back all selections for confirmation and allows for any changes before printing the completed ballot card, which is then stored securely until Election Day alongside all other ballots. (*Id.*).

Plaintiffs claim the remote voting option is problematic because they cannot fill out the paper absentee ballot on their own. As Plaintiffs' expert Lou Ann Blake explained, "[e]ven if a blind or low-vision voter had access to a scanner that could read aloud the printed text, that individual would have no way to locate and fill in the bubble that appears next to a preferred

---

[4] In Jefferson County, neither in-person absentee voters using the ExpressVote machine nor permanent disability absentee voters are required to have their ballots witnessed. (Doc. # 56-13 at 55:1-58:24, 93:18-94:3).

[5] Plaintiff Clayton does not drive and takes public transportation, calls Ubers, or gets rides from her pastor or her daughter. (Doc. # 56-5 at 11:14-20, 12:3-4, 25:14-18, 48:8-10). Plaintiff Peebles takes public transportation or hires drivers. (Doc. # 56-2 at 10:7-13:7). Plaintiff Presley relies on public transportation, Ubers, or rides from friends. (Doc. # 56-3 at 36:12-14, 38:2-9). Plaintiff Rissling regularly uses public transportation but sometimes uses Lyft or rides from friends. (Doc. # 56-4 at 74:11-17, 77:9-78:6).

[6] Plaintiff Peebles claims that because he cannot physically remove the ExpressVote machine's printed paper ballot from the machine to place it in the optical scanner, "the accessible option [the ExpressVote machine] is not accessible" to him. (Doc. # 56-2 at 87:16-89:21).

candidate's name on the paper ballot." (Doc. # 56-1 at 7). Plaintiff Rissling claims that if the absentee ballot were a physical document, he would not be able to vote "privately and independently," (Doc. # 56-4 at 103:16-23), and Plaintiff Presley testified that the current absentee voting program does not allow her to vote "privately and independently" at home. (Doc. # 56-3 at 45:17-46:6). For voters with manual dexterity limitations like Plaintiff Peebles, "paper ballots cannot be filled out . . . by a print-disabled voter . . . who is unable to handle a pen and paper." (Doc. # 56-1 at 7). For example, when Plaintiff Peebles voted absentee by mail in Lee County in 2020 and Mobile County in 2024, he was unable to fill out his own paper ballot. (Doc. # 56-2 at 86:7-21, 91:4-21, 104:5-12, 106:18-21). Instead, he shared his voting choices with his care aide so that she could fill out the ballot for him. (*Id.*).

B.     **Alabama's absentee voting program for UOCAVA voters**

Alabama ensures that members of the U.S. armed forces, their families, and other U.S. citizens residing overseas can register and vote absentee in Alabama elections. The Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA") requires states to allow "overseas voters" to register and vote absentee in elections. 52 U.S.C. § 203 *et seq.*; *see* Ala. Code § 17-11-40. Those eligible to vote using UOCAVA procedures include:

a.   A member of the uniformed services while in the active service, or an eligible spouse or dependent of such a member, who is a permanent resident of the state and is temporarily residing outside the territorial limits of the United States and the District of Columbia, who is qualified and registered to vote as provided by law.

b.   A member of the Merchant Marine of the United States, or an eligible spouse or dependent of such a member, who is a permanent resident of the state and is temporarily residing outside the territorial limits of the United States and the District of Columbia, who is qualified and registered to vote as provided by law.

c.   Any other citizen of the United States who is a permanent resident of the state and is temporarily residing outside the territorial limits of the United States and the District of Columbia, who is qualified and registered to vote as provided by law.

5

Ala. Code § 17-11-40(2)(a-c). Committee reports[7] accompanying the Military and Overseas Voter Empowerment (MOVE) Act,[8] enacted as part of the National Defense Authorization Act for FY2010, reflect Congress's determination that overseas and military voters were being effectively disenfranchised by systemic delays in absentee voting. Congress determined that existing processes often failed to provide sufficient time for voters to receive, mark, and return ballots; therefore, the legislation sought to "break down barriers to voting" by requiring earlier transmission of ballots, expanding electronic communication, and authorizing pilot programs to test new technologies. Consistent with that purpose, the statutory framework requires states to establish procedures to transmit blank absentee ballots "by mail and electronically" and to ensure voters have adequate time to vote. Related provisions such as 52 U.S.C. § 20304 direct federal authorities to facilitate the timely collection and delivery of marked ballots. And other federal guidance underscores that UOCAVA, as supplemented by the MOVE Act, is intended to guarantee effective absentee voting for overseas citizens. It does not mandate any single return mechanism, but leaves it to the states to exercise discretion over return methods – so long as they satisfy Congress's overarching objective of timely and meaningful ballot access. In Alabama, UOCAVA voters have been given this mandated access via a remote accessible vote-by-mail ("RAVBM") system that provides voters with ballots electronically. (Doc. # 56-1 at 7).

For the past four years, the Alabama Secretary of State's office has contracted with Democracy Live to administer its RAVBM system, OmniBallot, (Doc. # 56-19 at 50:4-15, 61:2-5), and Defendants have administered OmniBallot to UOCAVA voters (Doc. # 56-19 at 146:9-148:19). So, overseas UOCAVA voters are able to both receive and return their ballots

---

[7] *See* H.R. Rep. No. 111-288 (2009).

[8] The statutory framework is codified at 52 U.S.C. § 20302(a)(7), (f).

electronically.[9] (Docs. # 56-12 at 103:21-104:19; 56-15). When Defendants receive the electronic ballots from OmniBallot, they generally print them so they can be counted. (Doc. # 56-11 at 128:22-129:12).

Rather than being required to comply with the witnessing requirement for absentee ballots under Alabama law, UOCAVA electronic voters may complete a certificate attesting, under oath and under penalty of perjury, that everything they are submitting is true and the ballot is their own. (Doc. # 56-19 at 151:2-11). Defendant Bobo, Tuscaloosa County's AEM, also testified that UOCAVA voters returning their ballots electronically can complete and submit a witnessing affidavit with their ballot. (Doc. # 56-11 at 128:22-129:12).

OmniBallot is an accessible option for print-disabled voters. Use of RAVBM systems like OmniBallot would "allow blind, low-vision, and print-disabled voters to receive their absentee ballots online securely through their web browser and mark them on the computer, tablet, or smart phone using assistive technology." (Doc. # 56-1 at 9). Further, RAVBM vendors, including OmniBallot, "have extensive experience formatting ballots for screen readers, leading to few reports of accessibility problems by screen reader users that receive their ballots this way." (*Id.* at 10). RAVBM systems like OmniBallot also include an option that permits the e-return of ballots. (*Id.* at 10-11).

The OmniBallot system is not without cost. Extending the OmniBallot system to voters with print disabilities would cost $20,000 per election and $60,000 per cycle on a statewide basis. (Doc. # 59-6 at 11:15-12:23, 15:3-16:3).[10] In addition, allowing print-disabled voters in Defendants' counties to use a RAVBM system would likely require more employees to

---

[9] UOCAVA voters physically located inside the U.S. may receive a blank electronic ballot but are required to print and mail that ballot. (Doc. # 56-14 at 13).

[10] Democracy Live's representative did not provide financial figures on a county-by-county basis. (*See generally* Doc. # 59-6 at 12:13-23).

troubleshoot with voters using the system and print and count ballots, among other things. (*See, e.g.*, Doc. # 56-12 at 121:10-13, 154:11-155:2, 156:3-18).

## II.    Legal Standard

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of a material fact. *See id.* at 323. Once the moving party has met its burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by his own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *See id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable [trier of fact] could [find] for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

"When the *moving* party has the burden of proof at trial, that party must show *affirmatively* the absence of a genuine issue of material fact: it must support its motion with credible evidence . . . that would entitle it to a directed verdict if not controverted at trial." *United States v.*

*Four Parcels of Real Prop.*, 941 F.2d 1428, 1438 (11th Cir. 1991) (en banc) (internal quotation marks omitted). "Upon making this showing, the burden shifts to the non-moving party, who must produce 'significant, probative evidence demonstrating the existence of a triable issue of fact' to avoid summary judgment." *Baker v. Upson Reg'l Med. Ctr.*, 94 F.4th 1312, 1317 (11th Cir. 2024) (quoting *Four Parcels of Real Prop.*, 941 F.2d at 1438). That is, the moving party must demonstrate that, on all the essential elements on which it bears the burden of proof at trial, no reasonable jury could find for the nonmoving party. *Chanel, Inc. v. Italian Activewear of Fla., Inc.*, 931 F.2d 1472, 1477 (11th Cir. 1991). If the moving party makes such an affirmative showing, it is entitled to summary judgment unless the nonmoving party, in response, "come[s] forward with significant, probative evidence demonstrating the existence of a triable issue of fact." *Four Parcels of Real Prop.*, 941 F.2d at 1438 (alteration in original) (quoting *Chanel, Inc.*, 931 F.2d at 1477); *see also* Fed. R. Civ. P. 56(e).

"[A]t the summary judgment stage, the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Sawyer*, 243 F. Supp. 2d at 1262 (quoting *Anderson*, 477 U.S. at 251-52); *see also LaRoche v. Denny's, Inc.*, 62 F. Supp. 2d 1366, 1381 (S.D. Fla. 1999) ("The law is clear . . . that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment.").

Although there are cross-motions for summary judgment, each side must still establish the lack of genuine issues of material fact and that it is entitled to judgment as a matter of law. *See*

*Chambers & Co. v. Equitable Life Assur. Soc. of the U.S.*, 224 F.2d 338, 345 (5th Cir. 1955);[11] *Matter of Lanting*, 198 B.R. 817, 820 (Bankr. N.D. Ala. 1996). The court will consider each motion independently, and in accordance with the Rule 56 standard. *Matter of Lanting*, 198 B.R. at 820. "The fact that both parties simultaneously are arguing that there is no genuine issue of fact, however, does not establish that a trial is unnecessary thereby empowering the court to enter judgment as it sees fit." Wright, Miller & Kane, Federal Practice and Procedure § 2720, at 327-28 (3d ed. 1998). Also, these are the facts for summary judgment purposes only; they may not be the actual facts. *See Cox v. Admin. U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994) ("'What we state as 'facts' in this opinion for purposes of reviewing the rulings on the summary judgment motion [] may not be the actual facts.'") (citations omitted).

## III.    Discussion

Plaintiffs' Amended Complaint alleged two causes of action against Defendants. (Doc. # 4). Plaintiffs' first (and only remaining) cause of action alleges a Violation of Title II of the ADA. (42 U.S.C. § 12131-12134). Plaintiffs' second cause of action, which alleged a Violation of Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794 *et seq.*), was dismissed at the motion to dismiss stage. (Doc. # 33). Although that second claim was dismissed, as discussed below, § 504 and the interpretation of that statute are apposite to the analysis of Plaintiffs' ADA claim.

### A.    Plaintiffs have standing to pursue their individual non-injunctive relief claims

Standing is the "threshold question in every federal case, determining the power of the court to entertain the suit." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). "In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or particular issues." *Id*. The Eleventh Circuit has explained the requirements of standing as follows:

---

[11] The Eleventh Circuit recognizes that Fifth Circuit decisions rendered before the close of business on September 30, 1981 are binding precedent. *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206 (11th Cir. 1981) (en banc).

> Article III of the Constitution limits the subject-matter jurisdiction of federal courts to "Cases" and "Controversies." To have a case or controversy, a litigant must establish that he has standing, which requires proof of three elements. The litigant must prove (1) an injury in fact that (2) is fairly traceable to the challenged action of the defendant and (3) is likely to be redressed by a favorable decision.

*Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1245 (11th Cir. 2020) (internal quotations omitted) (citing U.S. Const. art. III, § 2; *United States v. Amodeo*, 916 F.3d 967, 971 (11th Cir. 2019); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)).

Defendants argue that (1) Plaintiffs Rissling, Presley, and Clayton lack standing to bring claims individually, (2) Plaintiffs lack standing to obtain countywide injunctions for print-disabled voters, and (3) Plaintiff NFB-AL lacks standing to obtain relief for its members or anyone else. (Doc. # 71-1 at 19-24). The court addresses each of Defendants' arguments, in turn.

### 1. Plaintiffs Rissling, Presley, and Clayton have standing to bring their individual ADA claims

As stated, to have standing, Plaintiffs Rissling, Presley, and Clayton "must prove (1) an injury in fact that (2) is fairly traceable to the challenged action of [Defendants] and (3) is likely to be redressed by a favorable decision." *Jacobson*, 974 F.3d at 1245. "In ADA cases, courts have held that a plaintiff lacks standing to seek injunctive relief unless he alleges facts giving rise to an inference that he will suffer future discrimination by the defendant." *Shotz v. Cates*, 256 F.3d 1077, 1081 (11th Cir. 2001) (citing *Proctor v. Prince George's Hosp. Ctr.*, 32 F. Supp. 2d 830 (D. Md. 1998); *Hoepfl v. Barlow*, 906 F. Supp. 317 (E.D. Va. 1995); *Aikins v. St. Helena Hosp.*, 843 F. Supp. 1329 (N.D. Cal. 1994)).

Defendants argue that because Plaintiffs Rissling, Presley, and Clayton "have no plans to vote absentee in the future," they lack standing. (Doc. # 71-1 at 23-24). Although it is a close question, the argument fails. Plaintiffs represent that they prefer to vote in-person *if able*, and note that they may not always *be able* to vote in-person. Plaintiff Rissling stated that he "prefer[s] to vote in-person and on Election Day" and reserves absentee voting for occasions where he is not

able to vote in-person, such as inclement weather, weddings, or family reunions. (Doc. # 56-4 at 88:16-89:3). Plaintiff Presley stated that she likes to use the ExpressVote machine when she votes in-person, but if she became homebound, she would need to vote absentee electronically. (Doc. # 56-3 at 41:5-43:3). Plaintiff Clayton stated that she would vote absentee if she could not get to the polls. (Doc. # 56-5 at 64:3-65:5). Of course, the purpose and nature of absentee voting is to provide a secondary way to vote for those who, for a number of reasons,[12] are unable to vote in-person on Election Day. If Plaintiffs were to vote absentee in the future, they claim they would suffer future discrimination by Defendants because they cannot vote absentee by mail. *See Shotz*, 256 F.3d at 1081. On this record, the court finds that Plaintiffs have standing to bring their non-injunctive relief ADA claims.

Defendants separately argue that Plaintiffs lack standing to obtain countywide injunctive relief for all print-disabled voters in their respective counties. (Doc. # 71-1 at 19-21). Defendants raise substantial arguments in support of their position: (1) Plaintiffs cannot obtain relief for non-party voters because no Plaintiff has standing to assert the rights of unaffiliated third parties, *see*

---

[12] Voters applying to vote absentee in Alabama must meet one or more of the following requirements:

(1) The person expects to be out of the county or the state, or the municipality for municipal elections, on election day.
(2) The person has any physical illness or infirmity which prevents his or her attendance at the polls, whether he or she is within or without the county on the day of the election.
(3) The person expects to work a shift which has at least 10 hours which coincide with the hours the polls are open at his or her regular polling place.
(4) The person is enrolled as a student at an educational institution located outside the county of his or her personal residence, attendance at which prevents his or her attendance at the polls.
(5) The person is a member of, or spouse or dependent of a member of, the Armed Forces of the United States or is similarly qualified to vote absentee pursuant to the federal Uniformed and Overseas Citizens Absentee Voting Act, 52 U.S.C. §§ 20301-20311.
(6) The person has been appointed as an election officer or named as a poll watcher at a polling place other than his or her regular polling place.
(7) The person is a caregiver for a family member to the second degree of kinship by affinity or consanguinity and the family member is confined to his or her home.
(8) The person is incarcerated in prison or jail and has not been convicted of a felony involving moral turpitude.

Ala. Code § 17-11-3. Further, "a qualified voter who has a permanent disability preventing his or her attendance at the polls may vote by absentee ballot." *Id.* § 17-11-3.1.

*Warth*, 422 U.S. at 499; (2) any injunctive relief should be limited to redressing the injuries of the named Plaintiffs rather than all print-disabled voters countywide, *see Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); (3) Plaintiffs cannot satisfy the requirements for third-party standing because they have shown neither a close relationship with non-party print-disabled voters nor any hindrance to those voters' ability to bring their own claims, *see Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004); and (4) Plaintiffs have not pointed to any real and immediate threat of future injury to justify any injunctive relief. But, these points are largely academic here.[13] Because Plaintiffs' ADA claim fails on the merits, as explained below, the scope of an injunction is not an issue the court need address.

### 2. Plaintiff NFB-AL has associational standing to seek non-injunctive relief for its members

As the Supreme Court recently explained, "where the plaintiff is an organization, the standing requirements of Article III can be satisfied in two ways. Either the organization can claim that it suffered an injury in its own right or, alternatively, it can assert 'standing solely as the representative of its members.'" *Students for Fair Admissions, Inc. v. Pres. & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023) (quoting *Warth*, 422 U.S. at 511). NFB-AL has asserted its claims under the second prong – the associational standing approach. (Doc. # 59-2 at 12-14).

---

[13] There is another problem with the countrywide injunctive relief sought by Plaintiffs. In *Trump v. CASA, Inc.*, the Supreme Court emphasized that federal courts must respect traditional limits on equitable relief and Article III standing by tailoring injunctions to the parties before the court, rather than issuing sweeping, programmatic relief that effectively governs nonparties. The Court explained that when plaintiffs seek relief benefiting a broader group, the proper procedural vehicle is a class action under Federal Rule of Civil Procedure 23, which imposes requirements of numerosity, commonality, typicality, and adequacy to justify binding absent parties. Absent Rule 23 certification, a plaintiff generally may obtain only relief necessary to redress his or her own injury, not universal or nationwide injunctions extending to others who are not before the court. *See Trump v. CASA, Inc.*, 606 U.S. 831 (2024) (reaffirming limits on nationwide injunctions and the need to proceed through Rule 23 for classwide relief).

To the extent the individual Plaintiffs seek broad injunctive relief on behalf of others not before the court, they are not entitled to it. To be fair, their complaint could be read to seek a more modest recovery of individual (divisible) declaratory relief, which would entitle them to personally to participate in electronic balloting. But, if that is the relief they seek here, their claims fail on the merits.

The Eleventh Circuit has recognized that "an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Greater Birmingham Ministries v. Sec'y of State for State of Ala.*, 992 F.3d 1299, 1316 (11th Cir. 2021) (citing *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)). Defendants do not dispute that the interests NFB-AL seeks to protect are germane to the organization's purpose. (Doc. # 71-1 at 21). The remaining prongs NFB-AL must satisfy are the first and third prongs.

To satisfy the first prong of the associational standing test, "organizational plaintiffs need not establish that all of their members" have been injured but must point to at least one member who would have standing. *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1342 (11th Cir. 2014) (quoting *Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153, 1163 (11th Cir. 2008)). When pointing to the member or members who would have standing, the organizational plaintiff may rely on a specific allegation "that one of its members or constituents has suffered an injury that would allow it to bring suit in its own right." *Doe v. Stincer*, 175 F.3d 879, 885 (11th Cir. 1999); *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009). The bottom line is that the NFB-AL must point to at least one of its members who has suffered an injury in fact, that is traceable to a challenged action (or inaction), and would be redressed by a favorable decision. *Lujan*, 504 U.S. at 561; *see Jacobson*, 974 F.3d at 1245.

NFB-AL has shown that at least one of its members has standing. As discussed above, both Plaintiff Clayton and Plaintiff Rissling have standing to sue in this case, and both Plaintiff Clayton and Plaintiff Rissling are members of NFB-AL. (Docs. # 58 at 10, ¶ 14; 56-6 at 10).

14

To satisfy the third prong, NFB-AL must show that "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Greater Birmingham Ministries*, 992 F.3d at 1316. This prong is met as to any non-injunctive relief that is sought. Thus, because NFB-AL can satisfy all prongs of the associational standing test, NFB-AL has associational standing to sue.

### B.    Plaintiffs' ADA Claim

Plaintiffs' remaining claim is asserted under Title II of the ADA. Plaintiffs allege that:

> Defendants' absentee voting processes discriminate against Plaintiffs and other blind and print disabled voters because these individuals cannot read or mark their ballots secretly, privately and independently, but voters without vision and print disabilities can.

> Defendants have failed to provide Plaintiffs and other blind and print disabled voters with an opportunity to vote by absentee ballot that is equal to the opportunity provided to voters that do not have disabilities.

> Defendants have failed to make reasonable modifications to Alabama's absentee voting process by offering accessible electronic voting to Plaintiffs and other voters who are blind or print disabled.

(Doc. # 4 ¶¶ 82-84).

As a threshold matter, the court quickly dispatches one argument made by Defendants. The ADA clearly applies to elections, and Defendants' assertions to the contrary lack merit. This court has previously addressed whether the ADA applies here and found that federal courts have considered ADA claims in the context of elections. *Rissling v. Bobo*, No. 7:23-CV-01326-LSC, 2024 WL 3106897, at *3-4 (N.D. Ala. June 24, 2024) (Coogler, J.) (collecting cases). "The Eleventh Circuit has applied the ADA to voting . . . ." *Id. See, e.g.*, *Am. Ass'n of People with Disabilities v. Harris*, 647 F.3d 1093, 1096 (11th Cir. 2011). This is not a particularly close question.

Next, the court must determine whether the Rule 56 record presents a genuine issue of material fact as to Plaintiffs' ADA claim. It does not. The facts are largely undisputed. This case

presents questions of law. And, to answer these questions, the court begins with the statutory language.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. In light of this statutory text, our circuit has determined that to prevail on an ADA Title II claim,[14] a plaintiff must establish:

> (1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) that the exclusion, denial of benefit, or discrimination was by reason of the plaintiff's disability.

*Silberman v. Mia. Dade Transit*, 927 F.3d 1123, 1134 (11th Cir. 2019) (quoting *Bircoll v. Miami-Dade Cnty.*, 480 F.3d 1072, 1083 (11th Cir. 2007) (citing *Shotz v. Cates*, 256 F.3d 1077, 1079 (11th Cir. 2001))).

"Public entities" include state and local governments and instrumentalities of state or local governments. *Id*. § 12131(1). It is undisputed that Defendants are AEMs of three of the largest counties in Alabama. (Docs. # 59-2 at ¶ 19, 71-1 at ¶ 19). Thus, Defendants are considered "public entities" under the ADA. The court next turns to the elements identified in *Silberman* and analyzes each, in turn.

---

[14] Usually, federal courts are called on to adjudicate claims made under Title I of the ADA, which categorically governs employment claims. Under Title I of the ADA, a plaintiff can proceed on theories of discrimination: disparate treatment, disparate impact, or failure to accommodate. *Raytheon Co. v. Hernandez*, 540 U.S. 44, 52 (2003); *Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1212 n.6 (11th Cir. 2008). A review of the record shows that Plaintiffs have not pleaded or pursued a disparate-treatment claim or a disparate-impact claim. Rather, the only claim they have pleaded and pursued is under Title II, which does not recognize these theories.

16

### 1.    Plaintiffs are qualified individuals with disabilities under the ADA

The ADA defines a disability as "a physical or mental impairment that substantially limits one or more major life activities of such individual." 42 U.S.C. § 12102(1). And major life activities include "performing manual tasks, seeing, . . . walking, [and] reading." *Id.* § 12102(2)(A). The definition of disability is construed broadly and in favor of coverage of individuals. *Id.* § 12102(4).

Plaintiffs Presley and Rissling are completely blind (Docs. # 56-3 at 12:19; 56-4 at 16:1), Plaintiff Clayton has advanced glaucoma that has significantly damaged her vision (Doc. # 56-5 at 12:10, 18:16-17, 19:6-8), and Plaintiff Peebles has cerebral palsy (Doc. # 56-2 at 8:15-16, 16:1-4). It is undisputed that Plaintiffs Rissling, Peebles, Clayton, and Presley have print disabilities that interfere with their ability to read, mark, and/or handle printed paper documents. (Docs. # 59-2 at ¶ 1; 71-1 at ¶ 1; 56-1 at 6-7). Thus, because each individual Plaintiff has "a physical . . . impairment that substantially limits one or more major life activities," 42 U.S.C. § 12102(1), Plaintiffs are legally disabled under the ADA.

Further, Plaintiffs are currently eligible to vote absentee under Alabama law and have done so in past elections. In Alabama, "a qualified voter who has a permanent disability preventing his or her attendance at the polls may vote by absentee ballot." Ala. Code § 17-11-3.1. As described above, Plaintiffs are all permanently disabled, and Plaintiffs do not drive due to their disabilities. (Docs. # 56-5 at 11:14-20, 12:3-4, 25:14-18, 48:8-10; 56-2 at 10:7-13:7; 56-3 at 36:12-14, 38:2-9; 56-4 at 74:11-17, 77:9-78:6). While they may be able to access public transportation or rely on friends and family for transportation (*id.*), it is also reasonable to expect that their inability to transport themselves to the polls could interfere with their attendance at the polls. Plaintiffs have expressed their desire to vote absentee in a way that is accessible to them. Thus, Plaintiffs can or will "meet the essential eligibility criteria" to vote by absentee ballot. 42 U.S.C. § 12131(2); *see*

Ala. Code § 17-11-3.1. Because Plaintiffs are disabled and meet the essential eligibility criteria to vote absentee in Alabama, the court finds that Plaintiffs are qualified individuals under the ADA.

### 2.    Plaintiffs have ready access to the benefit, service, and activity of voting and, more precisely, absentee voting

The second element requires a Title II ADA plaintiff to show that they were "either excluded from participation in or denied the benefits of a public entity's service, programs, or activities, or [were] otherwise discriminated against by the public entity." *J.S., III by and through J.S. Jr. v. Houston Cnty. Bd. of Educ.*, 877 F.3d 979, 985 (11th Cir. 2017) (quoting *Bircoll v. Miami-Dade Cnty.*, 480 F.3d 1072, 1083 (11th Cir. 2007)). Here, the question is whether Plaintiffs have been denied access to voting and, more precisely, absentee voting. The statute's implementing regulations, promulgated by the Department of Justice, elaborate that public entities must ensure that their programs, "when viewed in [their] entirety, [are] readily accessible to and usable by individuals with disabilities." 28 C.F.R. § 35.150(a).[15] To that end, a public entity must "make reasonable modifications in policies, practices, or procedures when the modifications are *necessary* to avoid discrimination on the basis of disability." 28 C.F.R. § 35.130(b)(7) (emphasis added). Plaintiffs assert that they have been discriminated against because they have been denied access to absentee voting in violation of Title II of the ADA. That argument fails for the following reasons.

---

[15] The proper weight to be given the Department of Justice's interpretations of Title II's implementing regulations is itself a matter that may warrant reconsideration in this Circuit. In *Shotz v. City of Plantation, Fla.*, the Eleventh Circuit applied *Chevron* deference to the DOJ's construction of Title II's regulatory scheme. 344 F.3d 1161, 1177-79 (2003); *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984). But, in *Loper Bright Enterprises v. Raimondo*, the Supreme Court overruled *Chevron* and held that courts must exercise independent judgment in determining the meaning of statutes and regulations, rather than deferring to an agency's interpretation simply because a provision is ambiguous. 603 U.S. 369, 412-13 (2024). To the extent *Shotz* rests on *Chevron* deference to the DOJ's reading of Title II or its regulations, the Eleventh Circuit may wish to consider whether that aspect of the decision remains good law in light of *Loper Bright*. In any event, the plain text of Title II and its regulations do not support Plaintiffs' claim.

a.        **By virtue of their rights under Section 208 of the Voting Rights Act, which Alabama has statutorily incorporated, Plaintiffs have meaningful access to the benefit of absentee voting**

Plaintiffs already have fully benefited from a congressionally mandated specific accommodation that grants them ready access to absentee voting. Although their claim arises under Title II of the ADA, which provides a general framework requiring access to all public entities provided by government services, Congress addressed the specific question of how voters with print disabilities are to be given access to the ballot box. And it did so through a separate, more targeted provision: Section 208 of the VRA. Section 208 provides that "[a]ny voter who requires assistance to vote by reason of blindness, disability, or inability to read or write may be given assistance by a person of the voter's choice." 52 U.S.C. § 10508.

The legislative history of Section 208 confirms that Congress enacted it specifically to combat discrimination against blind and disabled voters (as well as illiterate voters) and to guarantee meaningful ballot access to voters with disabilities. *See* S. Rep. No. 97-417, at 62 (1982) (finding that print-disabled voters "run the risk that they will be discriminated against at the polls and that their right to vote in state and federal elections will not be protected"). When Congress added Section 208 to the VRA in 1982, the Senate Judiciary Committee explained that the provision was designed to ensure that voters who, "because of blindness, disability, or inability to read or write, need assistance in voting, will be able to choose anyone they wish to help them." *Id.* The Committee noted that state laws limiting who could help disabled voters had the effect of keeping those voters from the polls. Section 208 was designed to fix that problem. *Id.* ("People requiring assistance in some jurisdictions are forced to choose between casting a ballot under the adverse circumstances of not being able to choose their own assistance or forfeiting their right to vote."). In other words, Congress decided the way to "limit the risks against [print-disabled voters] and avoid denial or infringement of their right to vote" was to in essence permit this

19

accommodation – that is, to allow them to choose a trusted helper. *Id.* ("The committee has concluded that the only kind of assistance that will make fully 'meaningful' the vote of the blind, disabled, or those who are unable to read or write, is to permit them to bring into the voting booth a person whom the voter trusts and who cannot intimidate him.").

Although perhaps not directly analogous, there is a well-established principle that says when two statutes address the same subject, the more specific one controls. *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) ("[T]he specific governs the general.") (citing *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992)). Title II is a broad, general civil rights statute that guarantees disabled persons the right to have access to – *i.e.*, to participate in – a number of public entity programs. Unlike Title II's general nature, Section 208 is laser focused on the specific issue of how print-disabled voters are to be accommodated at the ballot box and in absentee voting. When Congress has provided a specific solution to a specific problem, this court declines to use a general statute to expand on that solution. *See Varity Corp. v. Howe*, 516 U.S. 489, 519 (1996) (Thomas, J., dissenting) ("Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions."). Application of Title II's general accessibility requirements are already met here as, over forty years ago, Congress provided a statutory right designed to give print-disabled voters access to voting generally and to absentee voting in particular.

>    **b.**    **Plaintiffs argue they should be given an equal opportunity to absentee vote, but they already have meaningful access to absentee voting**

Plaintiffs complain that the current system denies them an equal opportunity[16] to vote absentee. That argument is off the mark because "equal opportunity" and "meaningful access" are

---

[16] The term equal opportunity is found not in the statute's text, but in the regulations the Justice Department promulgated under the statute. In any event, the question is what does it mean to have an equal opportunity to vote or absentee vote.

synonymous, and Plaintiffs have ready access to absentee voting in their respective counties.

In *Alexander v. Choate*, the Supreme Court addressed what federal disability law[17] requires of public entities in terms of access to public entity provided benefits. 469 U.S. 287, 301 (1985). In *Alexander*, the Supreme Court, in part, was presented with the question of what "equal opportunity" meant. That is, the Court examined regulations promulgated under the Rehabilitation Act that required "handicapped persons" (the term used in the Rehabilitation Act) to be afforded equal opportunity to obtain the same result or gain the same benefit as their non-handicapped comparators. *Id.* at 305 (citing 45 C.F.R. § 84.4(b)(2) (1984)). The Court held that the relevant inquiry is whether disabled individuals are afforded "meaningful access" to the benefit in question. *Id.* "Meaningful access" is not identical access, and not access in any particular form. *Id.* Further, "to assure meaningful access, reasonable accommodations in the [public entity's] program or benefit may have to be made," but public entities are not required "to make fundamental or substantial modifications to accommodate" disabled individuals. *Id.* at 300-01.

Title II's implementing regulations echo this same standard. The regulations define "equal opportunity" as "an equal opportunity to participate in or benefit from the aid, benefit, or service." 28 C.F.R. § 35.130(b)(1)(ii). A public entity need not ensure that disabled individuals participate in an identical manner as non-disabled individuals, only that they have the same opportunity to participate. *Id.* § 35.130(b)(1)(iii). It follows that Title II does not require public entities to provide a voter's preferred accommodation where existing measures available to that voter already provide meaningful access. *See Bircoll*, 480 F.3d at 1087-88; *Stewart v. Happy Herman's Cheshire Bridge,*

---

[17] *Alexander* interpreted § 504 of the Rehabilitation Act. 29 U.S.C. § 794. Section 504 provides that: "No otherwise qualified handicapped individual . . . shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794. The language of § 504 and Title II are virtually indistinguishable.

*Inc.*, 117 F.3d 1278, 1286 (11th Cir. 1997) ("[A] qualified individual with a disability is 'not entitled to the accommodation of her choice, but only to a reasonable accommodation.'") (Title I).

Applying the reasoning of *Alexander*, Plaintiffs have meaningful access to Alabama's absentee voting program. Alabama law and Section 208 authorize any voter to receive assistance "from any person the voter chooses." Ala. Code § 17-9-13; 52 U.S.C. § 10508; *see also Ala. State Conf. of the NAACP v. Marshall*, 746 F. Supp. 3d 1203, 1247 (N.D. Ala. 2024) ("A blind, disabled, or illiterate voter may require assistance ordering, requesting, obtaining, completing, and returning or delivering an absentee ballot application. Such assistance is guaranteed by Section 208[]"). Plaintiffs may therefore designate an individual of their choosing, including a trusted family member or an AEM staff member, to help them mark, complete, and return their absentee ballots. Plaintiffs have this right under both Alabama and federal law. *Meaningful access*, in the sense that *Alexander* demands it, plainly already exists, and it is unnecessary to provide Plaintiffs with access to the RAVBM system to vote absentee.

A voter wishing to vote absentee, whether by using Section 208 assistance or electronic balloting provided to comply with UOCAVA and the MOVE Act, has the same ready access to the voting process. These different methods all give access. Electronic balloting may permit private and independent voting. The question is whether both systems permit meaningful access. They do. And, although they are unquestionably different in their mechanics, there is no guarantee of precisely equal processes. *Alexander*, 469 U.S. at 722-23.

### c.    Title II does not require ballot secrecy

Plaintiffs next argue that they have a right to vote "private[ly], independent[ly], and remote[ly]," but that argument finds no support in the text of Title II or its implementing regulations. Nor is such a requirement consistent with the "accommodation" Congress has designed – indeed, required – by way of Section 208.

22

Title II prohibits exclusion from a "service, program, or activity," 42 U.S.C. § 12132, and its regulations require only that a program be "readily accessible to and usable by" disabled individuals, 28 C.F.R. § 35.150. Critically, neither the text of Title II nor its implementing regulations mention privacy in voting, secrecy of the ballot, or the right of a disabled voter to cast a ballot without assistance. The statute's operative prohibition is directed at *exclusion* and *denial of benefits. See* 42 U.S.C. § 12132. The regulations similarly speak to accessibility and usability of a program *in its entirety*, not to the replication of every feature of that program for each class of beneficiary. *See* 28 C.F.R. §§ 35.150, 35.130.

Congress has mandated that each disabled voter has the right to seek assistance from someone they choose and trust. The federal legislature indubitably understood the value of privacy in voting but nevertheless enacted the assister system. Indeed, the Senate Committee noted that "many such voters may feel apprehensive about casting a ballot in the presence of, or may be misled by, someone other than a person of their own choice." S. Rep. No. 97-417 at 62. And, it is reasonable to understand that Congress mandated that voters could seek assistance from someone of their choice – *i.e.*, a third party they trust to aid them with their ballot and maintain its confidence – which is a reliable, effective approach. *See* 52 U.S.C. § 10508 (Section 208 of the Voting Rights Act).

Finally, while Alabama law provides that "[e]very voter in Alabama shall have the right to vote a secret ballot, and that ballot shall be kept secret and inviolate," Ala. Code § 17-6-34, that is of no moment. First, it is not a right enforceable under the ADA. Second, Alabama law simultaneously and expressly permits any voter to "receive assistance from any person the voter chooses," Ala. Code § 17-9-13. This illustrates that assisted voting and the secret ballot coexist under Alabama law without conflict. Because Alabama law, which incorporates Section 208, also

23

ensures Plaintiffs have the assistance they need to have access to vote absentee, Plaintiffs have not established that they have been denied ready access to absentee voting.

### d. Plaintiffs have meaningful access to absentee voting, even without access to UOCAVA procedures

Plaintiffs suggest the solution to all this is simple: give them the same opportunity to electronically vote absentee that UOCAVA voters are given. This argument flounders for at least two reasons. First, as already noted above, Plaintiffs have meaningful access to the benefit of absentee voting without electronic ballots. Second, their argument assumes that this electronic ballot process is solely a program offered by the state. The first point has been explained in detail. So, the court moves to the second one.

Alabama did not choose to offer electronic ballot delivery on its own. Instead, it is a requirement imposed on the state (and the Defendant AEMs) by federal law. In implementing the mandates of UOCAVA and the MOVE Act, Alabama transmits blank absentee ballots to members of the uniformed services and overseas citizens by electronic means if the voter requests it. Congress passed UOCAVA and the MOVE Act to solve a specific problem: military and overseas voters are often too far from home to vote using antiquated systems involving mail-in paper absentee ballots. *See* H.R. Rep. No. 99-765, at 5, 10 (1986). UOCAVA and the MOVE Act do not mention disability, were not enacted to benefit disabled voters, and they extend their protections only to voters based on military service abroad or overseas residence. *See generally id.* Because Congress mandated a system like electronic ballot delivery for UOCAVA voters, Alabama had no choice but to provide it. 52 U.S.C. §§ 20302(a), 20310(5).

Plaintiffs are not members of the military or overseas citizens and are not eligible to vote under UOCAVA. Alabama's RAVBM system exists because Congress requires systems like it for eligible UOCAVA voters. In any event, the key point is this: the RAVBM system allows overseas voters access to absentee voting. Similarly, Section 208, which is incorporated into Alabama Code

24

§ 17-9-13, gives print-disabled voters that same access. That is, both processes allow meaningful access to absentee voting. Title II of the ADA does not require more. Even more to the point, there is no requirement that these two equally effective access tools be identical.[18] *Alexander*, 469 U.S. at 301.

### 3.    Plaintiffs have not shown they were denied access to electronic voting by reason of their disabilities

The final element of Plaintiffs' Title II claim requires them to show that the reason Defendants have denied Plaintiffs electronic absentee balloting is their disabilities. For starters, Plaintiffs' argument is framed around an incorrect premise – that Alabama (and therefore Defendants as AEMs) deny them access to electronic balloting and give such access to overseas citizens in a vacuum. To the contrary, the requirement to provide overseas citizens with accurate and timely voting materials and to address ballot transit issues is imposed on the state (and the Defendant AEMs) by federal law.

The court has already made these observations above. But they apply equally to the third element and bear repeating. Congress passed UOCAVA and the MOVE Act to break down the barriers to voting and ensure military and overseas voters can have their votes count. *See* H.R. Rep. No. 99-765, at 5, 10 (1986). The text of the UOCAVA and the MOVE Act make no mention of disability, and were not enacted to benefit disabled voters. Their protections extend only to voters who reside outside the United States. *See generally id.* Congress mandated systems like

---

[18] A close examination of Plaintiffs' argument reveals that they simply disagree with the policy choices Alabama has made and which Defendant AEMs have incorporated into their voting systems. That is, Alabama has determined that it can give meaningful access to print-disabled voters by relying on Section 208 and allowing them to seek assistance with absentee voting. At the same time, Alabama has also implemented Congress's mandate that it must give meaningful access to overseas voters, who confront the difficulties of relying on overseas mail, by allowing them to submit electronic ballots. Really, Plaintiffs' claims are disguised as a policy question: Should election officials make the technology provided to overseas voters available to disabled voters in their own counties and what would be the harm in doing so? "Should" questions are policy questions. Federal courts were not designed to set government policies but rather to adjudicate cases based on the facts and the law. And, while a small number of judges have, from time to time, mistakenly used judicial rulings to correct what they thought were poor policy choices, this court will not join that club.

electronic ballot delivery for UOCAVA voters, so it follows that Alabama had no choice but to provide such a system. 52 U.S.C. §§ 20302(a), 20310(5). To be clear, Alabama's RAVBM system exists because Congress required states to give eligible UOCAVA voters systems that remove the barriers discussed above. That mandated process can hardly be read as evidence of discriminatory intent attributable to Defendants and against Plaintiffs.

The bottom line is this – there is zero evidence in the Rule 56 record that Defendants have in any way excluded Plaintiffs from electronic balloting by reason of their disabilities. Both Defendants (Doc. # 71-1) and amicus curiae (Doc. # 87) have explained that there are substantial costs associated with extending electronic balloting beyond what Congress has required, and there are lingering concerns about cybersecurity with providing electronic ballots beyond what Congress has required. These decisions have nothing to do with Plaintiffs' print disabilities.

## IV.    Conclusion

For all these reasons, Plaintiffs' Motion for Summary Judgment (Doc. # 59) is due to be denied, and Defendants' Motion (Doc. # 71) is due to be granted. A separate order will be entered.

**DONE** and **ORDERED** this March 20, 2026.

**R. DAVID PROCTOR**
SENIOR U.S. DISTRICT JUDGE